## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | | |
|---|---|---|
| LEATHA WILLIAMS, as guardian of a minor, LAUREN WILLIAMS and ALICIA WILLIAMS, | ) ) ) ) | |
| Plaintiff, | ) ) | No.  3:05-cv-141<br>Jarvis/Shirley |
| v. | ) ) | |
| CAMPBELL COUNTY, TENNESSEE, et al., | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

John C. Duffy
Attorney for Defendants
P.O. Box 11007
Knoxville, TN  37939-1007
Phone:  (865) 766-0904

## STATEMENT OF CASE

On February 16, 2005, Leatha Williams, as guardian of a minor Lauren Williams, and Alicia Williams ("Plaintiffs") filed suit in the Circuit Court of Campbell County, Tennessee against the Defendants, asserting claims under 42 U.S.C. § 1983 and state law. (Complaint) Plaintiffs claim that Plaintiffs' decedent, Ted Williams, was held on suicide watch in the Campbell County Jail, and that the Defendants were deliberately indifferent to the serious medical needs of the decedent, who committed suicide. (Id.) Plaintiffs also claim that the Defendants were negligent in failing to remove personal clothing and other items from the decedent's cell. (Id.)

Defendants filed a Notice of Removal from the Circuit Court of Campbell County, Tennessee, to the United States District Court for the Eastern District of Tennessee at Knoxville on March 16, 2005. (R.1: Notice of Removal from Circuit Court)

## STATEMENT OF FACTS

The decedent, Ted Williams, was formerly a Campbell County Deputy for approximately 11 years, and a former member of the Narcotics Unit. (McClellan Aff. ¶ 2) Williams' employment was terminated on August 30, 1999 as the result of Williams being charged with four counts of Obtaining Controlled Substance by Fraud. (Id.) A guilty verdict was entered against Williams in the Campbell County Criminal Court on September 1, 1999 on these charges, and Williams was sentenced to two years in the Tennessee Department of Correction and four years supervised probation. (Id., see also Ex. 1 attached thereto). Between 2001 and 2003, Williams was incarcerated in the Campbell County Jail on three separate occasions without incident. (McClellan Aff. ¶3, see also Ex. 2 attached thereto).

2

On February 11, 2004, Williams was indicted by the Campbell County Grand Jury on charges of Felonious Sale of Schedule II Controlled Substance, Felonious Sale of Schedule II more than .5 grams, and Felonious sale of Schedule IV Controlled Substance, and a Capias and Bond was issued for his arrest by the Campbell County Criminal Court. (McClellan Aff. ¶ 4, see also Exhibit 3 attached thereto) Williams was arrested by Deputy David Webber and transported to the Campbell County Jail on February 18, 2004. (Webber Aff. ¶ 2) This indictment and arrest was part of a drug "round-up" which involved 70-80 defendants. (Webber Aff. ¶ 3; Franklin Aff. ¶ 2) Deputy Franklin had no involvement with Williams other than his indictment or arrest. (Franklin Aff. ¶ 3) Deputy Samuel Franklin had no contact with Williams at the Jail or any time material to this case. (Franklin Aff. ¶ 4)

After being booked into the Jail, Williams was placed into the "hospital" cell by the Corrections Officers on duty at the time Williams was brought to the Jail. (McClellan Aff. ¶ 5) This cell is commonly used to segregate inmates from the general population. (Id.) Williams was placed into the "hospital" cell for his own protection due to his status as a former law enforcement officer and member of the Narcotics Unit. (Id.) Williams was not placed into the "hospital" cell because he was on suicide watch. (McClellan Aff. ¶ 6; Robbins Aff. ¶ 3; Ayers Aff. ¶ 3) The "hospital" cell is not used to segregate an inmate who had been placed on suicide watch, because it is inappropriate for this purpose. (Id.)

In deference to his status as a former law enforcement officer, extra efforts were made to ensure Williams' comfort during his incarceration, such as Williams being allowed to retain his personal clothing. (McClellan Aff. ¶ 7). Inmates placed on suicide watch are not allowed to retain their clothing; rather, they are given a suicide-prevention smock. (Id.). Williams was also allowed to retain a radio and an extension cord to power the radio that had been left in the cell by

3

the previous occupant. (McClellan Aff. ¶ 12; Robbins Aff. ¶ 9; Ayers Aff. ¶ 9) Such extension cords were common items in the general population housing at the Campbell County Jail and were used to power radios, TV's, fans, and other items. (Id.)

Sheriff McClellan, with Chief Scott accompanying him, spoke with Williams at approximately 2:30 p.m. on February 18, 2004. (McClellan Aff. ¶ 8; Scott Aff. ¶ 3) Sheriff McClellan had known Williams for roughly 20 years, in a personal and professional capacity, and wanted to check on Williams. (McClellan Aff. ¶ 8) Sheriff McClellan brought Williams a cup of coffee, and asked Williams if he thought he would be able to make bond. (Id.) Williams said that he thought he would be able to make his bond, and did not want to be transferred to another facility. (Id.) Sheriff McClellan and Williams talked for approximately 45 minutes, during which time Williams joked and laughed about his charges. (McClellan Aff. ¶ 8; Scott Aff. 3) Both Sheriff McClellan and Chief Scott believed Williams to be lighthearted and jovial. (Id.) Scott and McClellan also spoke to Williams on one other occasion during his incarceration and found him to be in a good mood. (McClellan Aff. ¶ 9; Scott Aff. ¶ 4) Williams did not appear suicidal to either Sheriff McClellan or Chief Scott at any time during his incarceration. (McClellan Aff. ¶ 10; Scott Aff. ¶ 6).

Corrections Officer Nora "Cis" Robbins and Corrections Officer Tony Ayers were on night shift duty during Williams' incarceration. (Robbins Aff. ¶ 4; Ayers Aff. ¶ 4) Officers Robbins and Ayers had completed basic TCI Jail training and 40 hours annual in-service training for each year they were employed by the Campbell County Sheriff's Department. (Robbins Aff. ¶ 2; Ayers Aff. ¶ 2) At the time of the decedent's incarceration, Officer Robbins had been employed for approximately 7 years and Officer Ayers had been employed for approximately 5 years. (Robbins Aff. ¶ 1; Ayers Aff. ¶ 1) As part of their TCI and in-service training, both

4

Ayers and Robbins had been trained to observe and respond appropriately to signs of suicidal intent, such as self-mutilation, sudden changes in behavior and emotion, refusal to eat or take medication, and a change in personal hygiene. (Robbins Aff. ¶ 2; Ayers Aff. ¶ 2)  If Williams had shown any signs of suicidal thoughts, he would have been questioned about his intentions and appropriate action would have been taken in response.  (Id.)

`          At approximately 11:15 Officer Robbins opened the viewing door to Williams' cell and asked him how he was doing.  (Robbins Aff. ¶ 5) Williams was lying on his back on the bunk, and turned and said that he was O.K.  (Id.)  At approximately 4:00 a.m. Deputy Ayers checked on Williams, but did not speak to him.  (Ayers Aff. ¶ 5)  Williams was lying on his bunk with the back to the door at that time.  Security checks of the Jail were conducted at 12:00 a.m., 1:30 a.m., 2:00 a.m., and 4:00 a.m., and everything appeared to be O.K.  (Robbins Aff. ¶ 6;  Ayers Aff. ¶ 6, see also Exhibit 4 attached thereto)  Additional "spot" security checks may have been conducted on specific portions of the Jail, but not recorded in the Jail Security Log. (Id.)

          At approximately 4:40 a.m. Officers Robbins and Ayers went to remove another inmate, Phillip Pack, from the "drunk tank," which is directly across the hall from the "hospital" cell where Williams was located.  (Robbins Aff. ¶ 7; Ayers Aff. ¶ 7)  In the process of removing Inmate Pack, Officer Robbins opened the viewing door to Williams' cell to check on him.  (Id.)  Officer Robbins found that Williams was not on his bunk, and saw his foot near the doorway. (Id.)  Officers Robbins and Ayers then opened the door to Williams' cell and discovered that Williams had committed suicide by hanging himself from the door of his cell with an extension cord.  (Id.)  Neither Officer Robbins or Ayers had received any indication, either verbal or otherwise, of suicidal thoughts or intentions by the decedent.  (Id.)

Officers Robbins and Ayers could tell from the discoloration of the decedent's face and body that the decedent was dead. (Robbins Aff. ¶ 8; Ayers Aff. ¶ 8) Supervisors were notified of the decedent's suicide, and an ambulance was dispatched to the scene. (Robbins Aff. ¶ 8; Ayers Aff. ¶ 8) Ambulance service personnel concluded Williams' was dead at the scene. (Robbins Aff. ¶ 8; Ayers Aff. ¶ 8) Williams had been incarcerated for approximately 43 hours before hanged himself. (McClellan Aff. ¶ 11) The Tennessee Bureau of Investigation was asked to perform an inquiry into the death of the decedent. (Scott Aff. ¶ 7) The TBI case file was closed with no finding of wrongdoing by any employee of the Campbell County Sheriff's Department. (Id.)

## STANDARD OF REVIEW

The standard for determining whether a summary judgment record presents a jury question under the subjective deliberate indifference standard was set out in *Williams v. Mehra*, 186 F.3d at 690 (6th Cir. 1999) (*en banc*). The Court explained the distinction between the mixed question of law and fact that determines liability, and the matters of subsidiary or basic fact. The questions of what information the Defendants actually possessed regarding the risk of injury and the Defendants' conduct in light of that knowledge are matters of subsidiary or basic fact. Id. The question of whether Plaintiffs' proof surpasses the deliberate indifference threshold is a mixed issue of law and fact which is treated as an issue of law. Id. To overcome summary judgment, the Plaintiffs must point to basic facts proving that the Defendants actually knew that the conduct in question constituted an excessive risk to the decedent's health and safety. Id. at 692. *Accord, Sandifer v. Nichols,* 62 F.3d 151, 155 (6th Cir. 1995). Plaintiffs must next prove that the Defendants' conduct in the face of such actual knowledge amounted to criminal recklessness. *Farmer v. Brennan,* 511 U.S. 825 (1994); *Sandifer*, 62 F.3d at 154.

6

<u>**LAW AND ARGUMENT**</u>

**I. ALL DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FEDERAL CLAIM BROUGHT PURSUANT TO 42 U.S.C. § 1983, BECAUSE PLAINTIFFS CANNOT MEET THEIR BURDEN OF PROVING THAT ANY INDIVIDUAL DEFENDANT HAD ACTUAL SUBJECTIVE KNOWLEDGE THAT THE DECEDENT POSED A SUBSTANTIAL SUICIDE THREAT .**

To establish a violation of the Eighth Amendment[1] regarding denial of medical care, plaintiffs must show that each particular defendant was deliberately indifferent to the decedent's, Ted Williams, serious medical needs. *E.g. Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999) (<u>en</u> <u>banc</u>); *Estelle v. Gamble*, 429 U.S. 97, 104-105 (1976). The Eighth Amendment is not implicated by every serious injury or death occurring in a jail, but only in a narrow class of deprivations involving serious injury inflicted by jail officials acting with a sufficiently culpable state of mind. *See Williams,* 186 F.3d at 691. Negligence, repeated negligence, or gross negligence does not implicate the Eighth Amendment. *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-686 (6th Cir. 2001); *Brooks v. Celeste*, 39 F.3d 125, 127-129 (6th Cir. 1994).

The deliberate indifference standard has both objective and subjective elements. *Wilson v. Seiter,* 501 U.S. 294, 298 (1991); *Caldwell v. Moore*, 968 F.2d 595, 602 (6th Cir. 1992). The objective component requires a plaintiff to show that the pain, illness or injury was sufficiently serious. *Id*. The subjective component requires a plaintiff to prove that defendant acted with a sufficiently culpable state of mind. *Id*.

Regarding the objective element, "A medical need is serious if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person

_____

[1]While the Eighth Amendment does not apply to pre-trial detainees, the Due Process Clause of the Fourteenth Amendment does provide them with a right to adequate medical treatment that is analogous to prisoners' rights under the Eighth Amendment.

would easily recognize the necessity for a doctor's attention." *Gaudreault v. Municipality of Salem Massachusetts,* 923 F.2d 203, 208 (1st Cir. 1999). The objective test is not whether the risk of harm was undeniably serious in hindsight, but whether it was obvious at the time. *See Durham v. Nu'Man*, 97 F.3d 862, 869 (6th Cir. 1996) *cert denied*, 117 S.Ct. 1337 (1997); *Sandifer v. Nichols,* 62 F.3d 151, 154 (6th Cir. 1995).

With regards to the subjective element, the Supreme Court has set a high standard of culpability for government officials before they can be held liable under 42 U.S.C. §1983 on a theory of deliberate indifference:

> We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan,* 511 U.S. 825, 837, 114 S. Ct. 1970, 1979 (1994). Thus, the deliberate indifference standard requires that plaintiffs prove actual, subjective knowledge on the part of a defendant sought to be held liable that a prisoner is exposed to a substantial risk of serious injury, and then that the official consciously disregarded the known risk. 511 U.S. at 838-840, 114 S. Ct. at 1980. It is not sufficient to prove that an official should have been aware of a risk of harm through the exercise of reasonable diligence. Id.

To overcome summary judgement with respect to the subjective element, a plaintiff must cite to the Court evidence in the record of "...facts from which the jury could conclude that (Defendant) was aware of facts from which (Defendant) could and did draw the inference that (Defendant's) conduct posed a substantial risk of serious harm to plaintiff." *Brooks*, 62 F.3d at 155; *Williams,* 186 F.3d at 691-692. A defendant is not liable under the Eighth Amendment

8

where the defendant is aware of the underlying objective facts, but believes (albeit unsoundly) that the risk to which the facts gave rise were insubstantial or nonexistent. *Farmer*, 511 U.S. at 842, 114 S. Ct. At 1982.

Defendants submit that the most closely analogous cases in this Circuit are *Gray v. City of Detroit,* 399 F.3d 612 (6th Cir. 2005), *Barber v. City of Salem, Ohio,* 953 F.2d 232 (6th Cir. 1992), and *Danese v. Asman*, 875 F.2d 1239 (6th Cir. 1989).

The plaintiff in *Gray* sued Officer Gross for failing to adequately monitor the decedent in his cell, and the City of Detroit for failing to train its officers to foresee and prevent jail suicides. 399 F.3d at 614. The decedent had been arrested and placed into a holding cell, which he destroyed portions of by ripping the phone from the wall and breaking the sink and toilet. Id. As a result, he was moved to a "suicide" cell. Id. The decedent had not expressed suicidal intent; rather, this move was to prevent further destruction of city property. Id. Later that day, the decedent was moved to a police cell in the Detroit Receiving Hospital as the result of his complaints of chest pain and shortness of breath. Id. at 614-615. The transferring officer said that the decedent gave no indications of being suicidal, and no one had informed her that the decedent was suicidal. Id. at 615. Later the same day, the decedent committed suicide. Id.

The Court said "suicide is a difficult event to predict and prevent and often occurs without warning. Both the common law and the recently developed constitutional law applying to those in custody have taken this uncertainty into account in developing rules of liability based on forseeability." Id. at 616. The right to a suicide screening arises only when it is *obvious* that an inmate has suicidal tendencies or propensities. Id. The plaintiff presented no evidence to support his claim that Officer Gross actually knew that Gray was suicidal. None of Gray's behavior had been self-injurious, and none of his complaints have been of the type to indicate

suicidal intent.  Id. The Court found that the decedent "did not demonstrate a 'strong likelihood' of committing suicide."  Id.  Because the decedent's conduct and statements had not given rise to a constitutional duty to screen or monitor him for suicide, there was no evidence that Officer Gross violated the decedent's rights in any way.  Id.  The Court held that Officer Gross was entitled to qualified immunity.  Id.

In Barber, plaintiff sought to hold jailers liable for failure to properly screen the decedent for suicidal tendencies and make proper jail checks and/or television monitoring to deter suicide. 953 F.2d at 236.  The last jail check was at 3:05 a.m., the decedent was found hanging at 8:25 a.m., and the time of death was 6:15 a.m.  Id. at 234.  Plaintiff specifically relied on proof of failure to monitor the decedent and proffered two affidavits of purported jail experts opining that the jailers failed to follow nationally recognized standards regarding placement and monitoring of the decedent.  Id. at 237.

The Court affirmed the district court's grant of summary judgment stating:  "While these conclusions (of plaintiff's experts) may be evidence of defendants' negligence, they do not establish the proper constitutional standard in regard to qualified immunity under §1983 for a jail suicide in January of 1982."  Id.  The Court also affirmed summary judgment on the merits of Plaintiff's Eighth Amendment claim as to the municipal defendant.  This Court adopted the following standard for liability: "Whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs."  Id. at 239-240.  It follows that Plaintiffs must present evidence in this case that there was a strong likelihood that Ted Williams would commit suicide if allowed to retain his personal clothing and a radio in his cell,

without constant or more frequent monitoring, and that the Defendants actually knew of that strong likelihood.

In <u>Danese</u>, the plaintiff's decedent, while crying, stated to jailers that he "wished he were dead" and told one jailer that if he did not get a cigarette he would hang himself. 875 F.2d at 1241. The time lapse between the last jail check and when the decedent was found hanging was thirty-one (31) minutes. <u>Id</u>. at 1241. The Court rejected plaintiff's contentions that the defendants should be liable because they placed plaintiff in a position where he could harm himself, then failed to monitor the decedent. Unable to find cases holding that there existed a clearly established right to such suicide prevention precautions, the Court reversed the district court's denial of qualified immunity.

With respect to allegations of inadequate jail checks, the decisions of other circuits are in general consensus that the failure to make jail checks of a potentially suicidal prisoner does not violate the Eighth Amendment unless the plaintiff presents evidence sufficient to support an inference that the particular defendant was actually aware of a substantial risk that the particular prisoner would commit suicide absent additional or different monitoring. *E.g. Hott v. Henneipin County,* 260 F.3d 901, 906-908 (8th Cir. 2001); *Rhyne v. Henderson County*, 973 F.2d 386, 393-394 (5th Cir. 1992). The Court in *Rhyne* held that absent evidence from prior incidents that the periodic checks were obviously inadequate, no jury question on deliberate indifference was presented. <u>Id</u>. at 393. *See also Yellow Horse v. Pennington County*, 225 F.3d 923, 929 (8th Cir. 2000) (affirming summary judgment in claim predicated on failure to make more timely jail checks absent evidence that guards were on actual notice of an excessive risk to the decedent's safety); *Liebe v. Norton*, 157 F.3d 574, 578-580 (8th Cir. 1998) (affirming summary judgment on claim predicated on infrequency of jail checks up to twenty-one minutes); <u>Williams v. Kelso</u>,

11

201 F.3d 1060, 1064-1068 (8ᵗʰ Cir. 2000) (Wellford J. sitting by designation) (jailers' state of mind not a factual issue for the jury where proof failed to establish more than negligence).  Cf. *Salazar v. City of Chicago,* 940 F.2d 233 (7ᵗʰ Cir. 1991) (where prisoner exhibits no external signs of serious internal illness or injury, the fact that he died in jail is not in and of itself proof of deliberate indifference absent evidence that the officers actually knew that plaintiff's bizarre behavior was not from drunkenness but serious injury).

In the instant case, plaintiffs must allege, and on summary judgment produce evidence sufficient to support a jury verdict in their favor, that the medical need at issue is "sufficiently serious" to satisfy the objective component of an Eighth Amendment claim.  511 U.S. at 834. Psychological needs **manifesting** themselves in suicidal tendencies are serious medical needs for purposes of the due process analysis.  *E.g. Horn v. Madison County Fiscal Court,* 22 F.3d 653, 660 (6ᵗʰ Cir. 1994); *Barber v. City of Salem, Ohio,* 953 F.2d 232, 239-240 (6ᵗʰ Cir 1992) (identifying the proper inquiry in suicide cases as "whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs"); *Molton v. City of Cleveland,* 839 F.2d 240, 243 (6ᵗʰ Cir. 1988).  Nonetheless, there is no general right of pretrial detainees to be correctly screened for suicidal tendencies.  875 F.2d at 1244.  Nor is there a generalized right of a prisoner to be protected against committing suicide. *Rich v. City of Mayfield Heights,* 955 F.2d 1092, 1096-1097 (6ᵗʰ Cir. 1992).  Thus, the right at issue here is the detainee's right to reasonable protection against taking his own life *if* that detainee has demonstrated a strong likelihood that he will commit suicide.

To establish a violation of this right, the plaintiff must show that the decedent demonstrated a strong likelihood of taking his own life and that the defendants acted with

deliberate indifference to that threat. *Barber v. City of Salem, Ohio,* 953 F.2d 232, 239-240 (6th Cir. 1992).

Subjectively, the plaintiffs must prove that a specific defendant was actually aware that allowing Ted Williams to keep his personal clothing, a radio, and an extension cord in his cell, with less than continuous monitoring, posed a substantial risk or "strong likelihood" that Ted Williams would commit suicide. *Williams*, 186 F.3d at 691-692; *Barber*, 953 F.2d at 239-240. Defendants challenge plaintiffs to prove that a reasonable person could draw the inference that allowing Williams to retain items in his cell with less than continuous monitoring posed a substantial risk of harm, and that any defendants did, in fact, draw this inference.

Plaintiffs identify the culpable conduct of the defendants as failing to monitor the decedent, who they allege had been placed on suicide watch. Plaintiffs also allege that the defendants are at fault for failing to remove clothing and other items from the decedent that he could have used to harm himself.

Plaintiffs theory is flawed *ab initio* because Ted Williams was **never** held on suicide watch during his incarceration at the Campbell County Jail. Plaintiffs have no proof to support their unfounded allegations. Ted Williams was placed into a segregation cell commonly referred to as the "hospital" cell. The "hospital" cell is the only cell available for the segregation of inmates other than the "drunk tanks," and is commonly used to house inmates who should be separated from the general population. The decedent was placed into this cell for his personal safety due to his former employment as a law enforcement officer in Campbell County.

Had Ted Williams exhibited suicidal behavior, he would not have been placed into the "hospital" cell, because it is inappropriate for the purpose of housing suicidal inmates. Also, an inmate labeled "at-risk" of committing suicide is not allowed to retain any of their personal

13

items when they are placed onto suicide watch, and is dressed in a green suicide prevention smock and placed into the suicide prevention cell.  The facts that, for over a 40 hour period, Ted Williams was placed into the "hospital" cell instead of the suicide prevention cell, allowed to wear his personal clothing instead of a suicide prevention smock, and allowed to retain other personal items, belies plaintiffs' contention that Ted Williams was on suicide watch.  Plaintiffs cite no factual information in their complaint from which to support this claim.

Further, plaintiffs will be unable to prove that a reasonable person could have inferred that the decedent was suicidal, and that the defendants did in fact draw this inference.  Sheriff Ron McClellan had known the decedent for approximately 20 years, both as a co-worker and friend.  McClellan spoke to the decedent at least twice during his incarceration, once for approximately 45 minutes.  McClellan found the decedent to be good humored on those occasions, laughing and joking about his charges.  Although Sheriff McClellan had known the decedent for around 20 years, nothing about the decedent's behavior indicated to McClellan that the decedent was harboring suicidal thoughts.  At no time during the decedent's incarceration did McClellan observe any behaviors or hear any verbal statements that led him to believe that the decedent would commit suicide.  McClellan found Williams' suicide to be a complete surprise.

Chief Deputy Charles Scott observed the above mentioned interactions between McClellan and the decedent, and also felt that the decedent was in good spirits.  Scott also heard the decedent joke about the offenses he was charged with.  Nothing about the decedent's behavior led Scott to believe that the decedent would take his own life.

Corrections Officers Nora "Cis" Robbins and Tony Ayers worked the night shift while Ted Williams was incarcerated.  Both Robbins and Ayers were TCI certified and had received training on how to evaluate inmates for suicidal tendencies, and how to respond appropriately if

14

an inmate were thought to be at risk.  If an inmate were thought to be a suicide risk, he would have been placed into a suicide prevention smock, housed in a cell with nothing from which to tie or loop items on, and been checked on regularly.  Both Robbins and Ayers checked on Williams throughout their shift and did not detect anything amiss.  Williams did not verbalize or show signs or suicidal intent during his incarceration that either Robbins or Ayers witnessed or learned of, until they found Williams deceased.

David Webber arrested the decedent and transported him to the jail.  Aside from that minimal involvement, neither David Webber or Samuel Franklin had any interaction whatsoever with the decedent during his incarceration.  They had no opportunity to observe the decedent or his behaviors during his 40 plus hours of incarceration, and as a result could not form any opinions about his mental state or any suicidal intentions that he may have harbored. Williams suicide came as a surprise.

Plaintiffs cannot prove that any of the individual defendants were actually aware that placing Ted Williams in the "hospital" cell and allowing him to retain personal items with less than continuous monitoring posed a substantial risk or "strong likelihood" that Williams would commit suicide.  *Williams*, 186 F.3d at 691-692; *Barber,* 953 F.2d at 239-240.  Evidence cannot be produced that will prove either that a reasonable person **could** draw the inference that placement in the "hospital" cell along with less than continuous monitoring posed a substantial risk of harm, or that any of the defendants in fact **did** draw this inference.  The record demonstrates that Ted Williams' suicide was an unexpected and unfortunate event, and that none of the defendants were actually aware prior to February 20, 2004 that Williams harbored suicidal intentions.

15

## II. ALL DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FEDERAL CLAIM BROUGHT PURSUANT TO 42 U.S.C. § 1983, BECAUSE PLAINTIFFS CANNOT MEET THEIR BURDEN OF PROVING THAT ANY INDIVIDUAL DEFENDANT EXHIBITED DELIBERATE INDIFFERENCE TOWARDS TED WILLIAMS SERIOUS PSYCHOLOGICAL NEEDS.

Plaintiffs cannot prove that any defendant exhibited deliberate indifference towards Ted Williams. For the reasons stated above in Section I, even if the Court were to assume, *arguendo,* that the instant Plaintiffs met the objective component of the deliberate indifference standard, Plaintiffs cannot prove the subjective component of the deliberate indifference standard: actual, subjective knowledge on the part of a defendant sought to be held liable that Ted Williams showed a strong likelihood that Williams would attempt to take his life. *Barber v. City of Salem, Ohio,* 953 F.2d 232, 239-40 (6th Cir. 1992)**.**

## III. CHIEF DEPUTY CHARLES SCOTT, INDIVIDUALLY, IS ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFFS CANNOT MEET THEIR BURDEN TO INTRODUCE ADMISSIBLE EVIDENCE OF FACTS WHICH, IF TRUE, WOULD ESTABLISH §1983 SUPERVISORY LIABILITY.

In *Hays v. Jefferson County, Kentucky*, 668 F.2d 869, 872-874 (6th Cir. 1982), the Sixth Circuit first enunciated the following, now well-known principles: 1) supervisory liability must be based on more than merely the right to control employees; 2) there must be a **direct causal link** between the allegedly unconstitutional acts of subordinate officers and the supervisory defendants; 3) supervisory liability based on allegations or proof of improper or inadequate supervision, training or control does not extend to isolated incidents; 4) plaintiffs must establish a sufficiently culpable state of mind of the supervisory official – that the action or failure to act was to some degree deliberate, rather than inadvertent; 5) a plaintiff must establish the "direct responsibility" of the supervisory official for the allegedly unconstitutional actions of subordinates; 6) the mere failure to act, even in the face of a statistical pattern of incidence of

16

misconduct is insufficient; 7) the supervisor must have either encouraged the specific incident of misconduct or in some other way directly participated in it, or at a minimum, a plaintiff must show the supervisory official at least implicitly authorized, approved or **knowingly** acquiesced in unconstitutional conduct of subordinate; and, where the constitutional violation is not proven to be part of a pattern past misconduct, a supervisory official may be held liable only where there is essentially a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable or can be characterized as "substantially certain to result**."** Id.

Since *Hays,* the Sixth Circuit has elaborated on § 1983 supervisory liability in numerous cases.  Supervisory liability cannot be based upon the mere failure to act, but upon the supervisor's **active**, unconstitutional behavior.  *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004).  Under a "direct participation" theory, the supervisor must have played an active role in the alleged violation of Plaintiff's constitutional rights.  *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002).  In all other cases, supervisory liability must be premised on a supervisor's active, unconstitutional behavior, not a mere failure to act.  *Id.; Combs v. Wilkinson*, 315 F.3d 548,  558 (6th Cir. 2002).  Under a "direct participation" theory, a plaintiff has the burden to establish that the supervisor either encouraged the specific incident of misconduct or otherwise directly participated in the conduct that is alleged to have violated the constitutional rights of the plaintiff.  *Shehee v. Luttrell,* 199 F.3d 295, 300 (6th Cir. 1999).

Where a §1983 plaintiff cannot demonstrate that the supervisory official directly participated with the subordinates in the allegedly unconstitutional behavior, "indirect supervisory liability" standards must be applied.  *Doe v. City of Roseville*, 296 F.3d 431, 439-440 (6th Cir. 2002).  In "direct liability" theories, a plaintiff cannot meet her burden of proof by

17

showing that the supervisors were sloppy, reckless or negligent in the performance of their duties. *Id*. Rather, supervisory liability must be assessed "in light of the information the defendants possessed" **prior to** the alleged constitutional violation by subordinates. *Id.; Doe v. Claiborne County, Tennessee,* 103 F.3d 495, 513 (6th Cir. 1996). Where the theory is predicated upon failure to take adequate measures with respect to training, supervision, etc., the failure of the supervisory official to take adequate precautions in this regard must amount to "deliberate indifference" to the rights of citizens. *Id*. "Deliberate indifference" can be established through tacit authorization of abuse, but only where the supervisor was confronted with a **widespread pattern** of constitutional violations **prior to** the incident in question such that he has actual or constructive knowledge of subordinates' unconstitutional behavior. *Id*. Proof that supervisory officials were aware of some "general misconduct" by subordinates, or alleged incidents of harassment brought to their attention, is insufficient. *Lillard v. Shelby County Board of Education,* 76 F.3d 716, 727-728 (6th Cir. 1996).

Finally, supervisory liability is distinguished from municipal liability in that the plaintiff must show that the specific supervisor played more than a passive role in the alleged constitutional violation of subordinates or mere tacit approval of the "goings on.*" Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999).

The Sixth Circuit has recently identified four avenues a plaintiff may take to prove the existence of a municipality illegal policy or custom. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429-430 (6th Cir. 2005): 1) the municipality's legislative actions or official agency policies; 2) action(s) taken by officials with final decision-making authority that are unconstitutional in and of themselves; 3) a "policy" of inadequate training or supervision; or 4) a "custom" of tolerance or acquiesce in the violation of citizens' federal rights. *Id*. Where municipal liability is

18

based on an "inaction theory," that is a custom or practice of tolerating the violations of citizens' constitutional rights prior to the incident in question, a plaintiff is required to demonstrate four elements: 1) the existence of a clear and persistent pattern of illegal activity; 2) notice of constructive notice or the part of municipal policy-makers; 3) policy-makers' tacit approval of, not just the conduct in general of officers, but **unconstitutional conduct**, such that their deliberate indifference in the failure to act can be said to amount to an official "policy of inaction"; and 4) that the municipal custom was the moving force or direct causal link in the individual officers' deprivation of the specific plaintiff's constitutional rights. Id. The Sixth Circuit in Thomas underscored the degree to culpability that policy-makers must have with respect to allegedly unconstitutional prior acts of subordinates. Id. at 430-431.

For example, expert testimony merely that there have been voluminous complaints against a police department similar to the constitutional conduct in question is insufficient alone to permit an inference of a policy, practice or custom of condoning the unconstitutional conduct. Id. Expert testimony in this regard that is merely conclusory, that is, not based upon underlying factual data provided by the defendants or lacking explanation of how the expert drew his conclusions from such data, cannot establish a "policy" of condoning unconstitutional actions of subordinates. *Id., See Berry v. City of Detroit,* 25 F.3d 1342, 1352-54 (6th Cir. 1994) (elaborating in detail on the nature of expert testimony necessary to establish a "policy" of condoning unconstitutional behavior); *Gaddis v. Redford Township,* 364 F.3d 763, 775 n. 11 (6th Cir. 2004) (while qualified experts' opinions are often entitled to be given weight in excessive force cases, the weight of such testimony is diminished to the extent the expert draws near to opining on the ultimate legal question).

19

For the reasons noted above in Section I, Chief Deputy Charles Scott had no notice of the suicidal tendencies of Ted Williams. Therefore, *a fortiori,* Scott cannot fairly be said either to be directly responsible for the death of Ted Williams, nor specifically encouraged subordinates to cause Williams harm or knowingly acquiesced in subordinates' behavior, the nature of which made the unconstitutionality of the subordinates' acts readily apparent. Since Charles Scott did not participate in nor agree to readily recognized unconstitutional behavior of subordinates, he is entitled to summary judgment on grounds both of absence of deliberate indifference and absence of a viable basis of §1983 supervisory liability.

**IV. ALL INDIVIDUAL DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BASED ON QUALIFIED IMMUNITY BECAUSE PLAINTIFF CAN NOT PROVIDE PROOF THAT WOULD AMOUNT TO A VIOLATION OF THE DECEDENT'S CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS, THE CONTOURS OF WHICH WERE SO DEFINED AT THE TIME OF THE EVENTS IN QUESTION THAT THE DEFENDANTS WERE ON NOTICE OF THE CLEAR UNLAWFULNESS OF THE ALLEGED CONDUCT.**

Even assuming this Court concludes that plaintiffs can present sufficient proof to permit a reasonable jury to infer that Williams' Constitutional rights Amendment were violated by one or more defendants, all individual defendants are nonetheless entitled to summary judgment based on qualified immunity. The burden is on the plaintiffs to identify what clearly established, governing case law in this District existed in February 2004, that declared these Defendants' actions unconstitutional with sufficient clarity that a reasonable officer would know that the conduct transgressed constitutional law. *Jeffers v. Heavrin*, 10 F.3d 380, 381-382 (6th Cir.1993); *Anderson v. Creighton*, 483 U.S. 635, 639-640 (1987). The inquiry is not whether the constitutional right allegedly violated was clearly established in a broad, abstract level of generality, but whether on the specific facts of the case, reasonable officials could have believed that their conduct was lawful. 483 U.S. at 640-641. If reasonable officers could disagree on

whether conduct violates the Constitution, immunity applies. *Caldwell v. Moore*, 968 F.2d 5953, 595 (6th Cir. 1992). Qualified immunity applies to police actions that were reasonable at the time in question, even if later determined to be mistaken. *Hunter v. Bryant*, 502 U.S. 224, 227-228 (1991).

The burden is on the plaintiffs to identify both the case from the requisite jurisdictional pool that is the source of Williams' clearly established right, and the facts from which the plaintiffs could establish a violation of that right. *Dominique v. Telb*, 831 F.2d 673, 677 (6th Cir. 1987); *Cagle v. Gilley*, 957 F.2d 1347, 1348 (6th Cir. 1992). To defeat immunity, the plaintiffs must show a substantial correspondence between the conduct in question and prior law. *Hughes v. City of North Olmstead*, 93 F.3d 238, 241 (6th Cir. 1996).

In the instant case, Defendants Charles Scott, David Webber, Sammie Franklin, Nora ("Cis") Robbins and Tony Ayres assert first that the Williams Plaintiffs cannot cite to the Court case law from the requisite jurisdictional pool governing in this District that so clearly defines the contours of Williams' Eighth Amendment rights regarding suicide precautions for persons exhibiting **no** outward manifestation of suicidal indicators, or enough cases with sufficiently analogous facts to put defendants on notice in February, 2004, that their conduct was objectively unreasonable under pre-existing law. Without burdening the Court with re-argument, Defendants respectfully incorporate herein by reference the factual record cites above. Based on those facts set forth in Defendants' Statement of Facts, all Individually sued Defendants submit that their conduct did not violate the Eighth Amendment. In any event, all Individual Defendants assert that the Williams Plaintiffs can cite no cases governing on this Court that establish the contours of the right to suicide protections of persons who **do not** exhibit outward manifestations of suicidal indicators with such clarity that the instant Individual Defendants

21

could not have reasonably disagreed about the lawfulness of their actions in February, 2004. Accordingly, Defendants Scott, Webber, Franklin, Robbins and Ayres respectfully submit that they are entitled to summary judgment both on the merits of Plaintiffs' constitutional claims and qualified immunity.

## V.  NO POLICY OR CUSTOM OF CAMPBELL COUNTY[2] WAS THE MOVING FORCE BEHIND ANY ALLEGED VIOLATION OF TED WILLIAMS' CONSTITUTIONAL RIGHTS.

A governmental entity can be held liable under §1983 only where a policy or custom attributable to the governmental entity caused the violation of the Plaintiffs' constitutional rights.[3] *Pembaur v. City of Cincinnati,* 475 U.S. 469, 477-479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1985); *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000) (en banc); *Doe v. Claiborne County, Tennessee,* 103 F.3d 495, 507-12 (6th Cir. 1996).  The Plaintiffs cannot base their claims against Campbell County solely on isolated conduct of persons lacking final policy-making authority.  *Fox v. Van Oosterum,* 176 F.3d 342, 347 (6th Cir. 1999); *Doe,* 103 F.3d at 506; *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  As stated by the Sixth Circuit:

---

[2] Plaintiff Williams' claims against Ron McClellan as Sheriff of Campbell County and Jerry Cross as County Mayor are superfluous as Campbell County is a named Defendant and suits against officials in their official capacities stand in the shoes of the entity they represent.  *Alkire v. Irving,* 330 F.3d 802, 810 (6th Cir. 2003); *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)

[3] If Ted Williams' Eighth Amendment rights were not violated by the Campbell County Defendants, the issue of Campbell County's policies and customs is moot.  *Gaddis v. Redford Township*, 364 F. 3d 763, 777 (6th Cir. 2004) (city could not be liable for alleged deficiencies in training and supervision where the officers trained and supervised committed no constitutional violation);  *Ewolski v. City of Brunswick,* 287 F. 3d 492, 516 (6th Cir. 2002) (same); *Smith v. Thornburg,* 136 F. 3d 1070, 1078 n. 12 (6th Cir. 1998) (same); *City of Los Angeles v. Heller,* 475 U.S. 796, 106 S. Ct. 1571 (1986) (same).

Rather, [Plaintiffs] must show that the [City] itself is the wrongdoer. Under Monell, the [City] cannot be found liable unless the Plaintiff can establish that an officially executed policy, or the toleration of a custom within the [City] leads to, causes, or results in the deprivation of a constitutionally protected right.

\* \* \*

In addition to showing that the [City] as an entity "caused" the constitutional violation, Plaintiff must also show a direct causal link between the custom and the constitutional deprivation; that is, [they] must show that the particular injury was incurred because of the execution of that policy.

*Doe, 103 F.3d at 507* (emphasis in original)(citations omitted). The Plaintiffs must prove a high degree of municipal culpability through municipal policymakers and demonstrate a direct causal link between Campbell County's conduct and the deprivation of federal rights. *Board of County Commissioners of Bryan County v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 1385, 137 L.Ed.2d 626 (1997).

The applicable standard of deliberate indifference to the rights of citizens requires proof of a deliberate or conscious choice by County policymakers with respect to the supervision of its officers. *Brown v. Shaner*, 172 F.3d 927, 930 (6th Cir. 1999). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Stemler*, 126 F.3d at 865. A showing of heightened negligence is insufficient. *Id.* at 865.

Only where the County's policymakers are actually aware of the need for more or different training or supervision, or the need is so obvious and the inadequacy so likely to result in a constitutional violation that knowledge can be inferred, will the deliberate indifference standard be met. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 388 (1989); *Stemler v. City of Florence*, 126 F.3d 856, 865-66 (6th Cir. 1997). The focus is on the alleged inadequacies of the training or supervision **program** itself rather than the training or supervision of a **single officer**. *Canton*, 489 U.S. at 388.

Defendant Campbell County respectfully submits that Plaintiffs can cite insufficient prior similar incidents that would put policymaking officials in Campbell County on notice of deficiencies in Campbell County Sheriff's Department policy, or of the need for different or additional training or supervision. Both Correctional Officers involved in this case are T.C.I. certified.  While Sheriff McClellan may be a final policymaker, plaintiffs can prove no alleged constitutional violation that was caused by a "policy" decision of Sheriff McClellan.

## VII.  PLAINTIFFS' CLAIM OF UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT IN THE CAMPBELL COUNTY JAIL IS BARRED BY *RES JUDICATA*, OR CLAIM PRECLUSION BY VIRTUE OF TED WILLIAMS' INCLUSION IN A PLAINTIFF CLASS CERTIFIED BY HONORABLE EON JORDAN WHICH WAS RESOLVED THROUGH A PRIVATE SETTLEMENT AGREEMENT AND THE DISMISSAL OF PLAINTIFFS' CLASS CLAIMS

If and to the extent that Plaintiffs' Complaint alleges that general conditions of confinement in the Campbell County Jail were unconstitutional, with respect to construction, maintenance, lighting, ventilation, plumbing and toilet facilities, recreation, fire escape, plans, and overcrowding - such claims are barred by *res judicata* or claim preclusion.  Such claims of general conditions of confinement were certified as a class action with the plaintiff class including the decedent, Ted Williams, and such class claims were dismissed by Order entered May 9, 2006 in *Michael Lynn Gray v. Campbell County, Tennessee et al.,* No. 3:03-CV-689. [Docs. 45,44,37].

Plaintiffs cannot establish that  injury to Ted Williams was foreseeable for the reasons stated above in Section I.  Since the risk that Ted Williams would commit suicide was not foreseeable, defendants did not owe a duty to Williams to take precautions to prevent him from taking his own life. Plaintiffs similarly cannot present proof that allowing Williams to keep a

24

radio and extension cord in his cell is an event sufficiently related to Williams' suicide to be the cause of that injury. Further, defendants submit the comparative fault of Ted Williams as a bar to recovery by Plaintiffs.

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been filed electronically. Notice of this filing will be sent by operation of the court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

Dated this 21 day of July, 2006.

BY:     /s/John C. Duffy